```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

BS PREMIUM HOLDINGS, LLC,

                  Plaintiff,            MEMORANDUM & ORDER
                                        21-CV-4872(EK)(TAM)
         -against-

PREMIUM SWEETS & DESSERTS INC.,
VISVAMATA NUTRIENTS LLC,
ANNAPURNA AMERICAS LLC, et al.,

                  Defendants.

-------------------------------------x
```

ERIC KOMITEE, United States District Judge:

This case concerns a trademark dispute. Plaintiff BS Premium Holdings, LLC ("BS Premium") moves for an injunction prohibiting Defendants, Premium Sweets & Desserts Inc. ("PSD") and its business partners,[1] from using the "Premium" name on a restaurant it is in the process of opening. As set forth below, the motion is DENIED because Plaintiff has not shown a sufficient likelihood of success on the merits.

## I. Background

Plaintiff BS Premium owns and operates three restaurants and five grocery stores in Queens, Brooklyn and the Bronx. Second Amended Compl. ("SAC") ¶ 1, ECF No. 43; Decl. of

---

[1] The other defendants – Visvamata Nutrients LLC, Annapurna Americas LLC Aims Ventures Management, LLC, and PSDC Jamaica LLC – are all limited liability companies based in the United States. *See* Decl. of Mohammed Iqbal Hossain ¶¶ 21, ECF No. 40-4.

Babu Khan ("Khan Decl."), Ex. 33, ECF No. 33-15 (map of parties' business locations in NYC). These businesses opened between 2011 and 2020. SAC ¶ 14; SAC, Ex. 1 (table), ECF No. 34-1. They sell a variety of food products, with an emphasis on Bengali cuisine, under a handful of trade names that have the word "Premium" in common: "Premium Sweets"; "Premium Sweets & Restaurant"; and "Premium Supermarket." SAC ¶ 1.

Defendant PSD is a Canadian corporation with its principal place of business in Ontario. *Id.* ¶ 4. PSD's Chief Executive, Mohammed Hossain, submitted a declaration stating that he and his wife began using the "Premium" name in Bangladesh in 1999 when they founded a company called Premium Sweets by Central. Decl. of Mohammed Iqbal Hossain ¶¶ 2-3, ECF No. 40-4. That company, like Plaintiff, specialized in Bengali food: "Bengali desserts, savory items, and ready to eat meals." *Id.* ¶ 3. The Hossains "experienced substantial commercial success" in Bangladesh, *id.* ¶ 6, opening more retail locations and restaurants over time using the Premium Sweets name. In 2008, they formed PSD to expand their operations to Canada. *Id.* ¶ 10. Altogether, the Hossains now operate "twenty-one retail shops and restaurants and three production facilities," employing approximately 1,250 people in Bangladesh and 140 in Canada. *Id.* ¶ 12.

2

In 2019, PSD made plans to open its first U.S. retail store and restaurant, Premium Sweets, in Queens, New York. *Id.* ¶ 20. The restaurant had its "soft-opening" on December 23, 2021. PSD's new restaurant is located in the same geographic area as most of BS Premium's stores and restaurants, and in close proximity to one of Plaintiff's locations. Khan Decl., Ex. 33, ECF No. 33-15 (map).

BS Premium uses the following mark on takeout menus and several of its store or restaurant awnings:



Khan Decl., Ex. 6, ECF No. 24-6. Plaintiff's stores and restaurants vary somewhat in name, but they all include the word "Premium" written in red, and a gold "P" written in Sanskrit font. For example:

3



Khan Decl., Ex. 3, ECF No. 24-3.[2]

Defendants are using this mark on the awning of their new restaurant:



Khan Decl., Ex. 9, ECF No. 24-9.[3]

BS Premium sued PSD for trademark infringement and moved for a preliminary injunction to prohibit Defendants "from operating, advertising, or promoting their restaurant using the trademarks and service marks PREMIUM RESTAURANT & DESSERT SHOP

---

[2] Plaintiff has held a New York state trademark and service mark registration since 2013. *See* Khan Decl., Ex. 7, ECF No. 24-7. Its trademark "consists of the words 'Premium Sweets' in English in a script font and in Sanskrit adjacent to a stylized 'P' in a hexagonal emblem." *Id.* Plaintiff does not have a federally registered mark; it applied for one in 2013 but "abandoned" the application in 2015. Khan Decl., Ex. 8, ECF No. 24-8.

[3] Defendant's mark is not registered federally or in New York state. PSD had a trademark registered with the U.S. Patent and Trademark Office, but it allowed the registration to lapse in June 2020 because its mark had changed. *See* Def. Opp. to Prelim. Inj. 8, ECF No. 40.

4

or PREMIUM SWEETS or any confusingly similar marks." Pl. Br. 11, ECF No. 23.[4] Neither party has requested an evidentiary hearing, and there are no material facts in dispute.[5]

## II.  Legal Standard

A preliminary injunction is an "extraordinary" remedy. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see also Two Hands IP LLC v. Two Hands Am., Inc.*, No. 21-CV-3855, 2021 WL 4437975, at *2 (S.D.N.Y. Sept. 28, 2021) (noting, in trademark dispute, that a preliminary injunction is a "drastic tool").[6] Such injunctions are "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain such an injunction, the moving party has the burden of demonstrating (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the party's favor, and (4) that an injunction is in the public interest. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir.

---

[4] Plaintiff originally filed its motion as a motion for a temporary restraining order. ECF No. 23. At a conference on January 6, 2022, Plaintiff agreed to convert the motion into a motion for a preliminary injunction.

[5] Plaintiff submitted additional material in connection with the preliminary injunction motion, but indicated that it sought to call no witnesses or otherwise present evidence at a hearing. The Court held oral argument on the motion on January 31, 2022.

[6] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

2015) (citing *Winter*, 555 U.S. at 20); *see Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 188 n.2 (2d Cir. 2019) (citing *Winter*, 555 U.S. at 20). In trademark cases under the Lanham Act, a rebuttable presumption of irreparable harm arises after a plaintiff succeeds in demonstrating the requisite likelihood of success on the merits. 15 U.S.C. § 1116(a).

### III. Discussion

In asserting trademark infringement and related claims, Plaintiff relies principally on Section 43(a) of the Lanham Act. Section 43(a) prohibits the use in commerce of "any word, term, name, symbol, or device, or any combination thereof" in a way that "is likely to cause confusion. 15 U.S.C. § 1125(a)(1). I address only Plaintiff's likelihood of success on the merits because that factor is dispositive.

"To prevail on a claim of trademark infringement, a plaintiff must show, first, that its mark merits protection, and, second, that the defendant's use of a similar mark is likely to cause consumer confusion." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss* & Co., 799 F.2d 867, 871-72 (2d Cir. 1986). The strength of a trademark claim is assessed according to the *Polaroid* factors identified by Judge Friendly in 1961. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). These are: (1) the strength of the

6

plaintiff's mark; (2) the similarity of the marks; (3) the competitive proximity of the products in the marketplace; (4) the likelihood that the senior user will "bridge the gap" by moving into the junior user's product market; (5) evidence of actual confusion; (6) the junior user's intent – good or bad faith – in adopting the mark; (7) the respective quality of the products; and (8) the sophistication of the consumers in the relevant market. *Id.* at 495. Each factor is to be evaluated for its relevance to the "ultimate question of likelihood of confusion as to the source of the product." *Lois Sportswear*, 799 F.2d at 872; *see also Brennan's Inc.*, 360 F.3d at 130.

**A. Strength of the Plaintiff's Mark**

The first *Polaroid* factor — the strength of Plaintiff's mark — is the hardest factor on which to reach a high-confidence assessment at this stage, given the evidence (and lack thereof) cutting both ways. Based on the existing evidence discussed below, I conclude that the Plaintiff is likely to establish moderate strength – at most.

"The strength of a mark refers to its ability to identify the source of the goods being sold under its aegis." *Brennan's Inc.*, 360 F.3d at 130. A mark's strength has two components: "its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." *Id.* The parties agree that the Premium mark is not inherently

7

distinctive. See Pl. Br. 21 (conceding as much). BS Premium says, however, that the mark has acquired distinctiveness through its use in New York City's restaurant and food-service industries. *See Brennan's Inc.*, 360 F.3d at 131 (acquired distinctiveness analysis "looks solely to that recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services").

To assess the "acquired distinctiveness" of a mark, the Second Circuit has identified six non-exclusive factors relevant to the secondary meaning inquiry: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 226 (2d Cir. 2012). Here, Plaintiff's evidence consists primarily of its sales figures. BS Premium says that it has generated $131 million in sales across its various restaurants and stores in over ten years of operation, Pl. Br. 26-27 — a lot of money, without question, for a group of local businesses. *See, e.g., R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39, 81 (S.D.N.Y. 2009) ($4 million dollars in sales indicative of secondary meaning); *Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp.

8

2d 633, 640 (S.D.N.Y. 2001) (describing $3 million in sales as "indisputable sales success").

But sales numbers, like evidence of advertising expenditures, do not constitute evidence *per se* of acquired distinctiveness; instead, they matter more or less according to whether they can logically be expected to translate into stronger consumer association of the mark with the business. *See, e.g., Easy Spirit, LLC v Skechers U.S.A. Inc.*, 515 F. Supp. 3d 49, 62 (S.D.N.Y. 2021) ("Simply showing that a certain amount was spent on advertising provides little support for secondary meaning absent some demonstration that the advertisements caused consumers to associate the mark with the plaintiff."); *cf. LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 654 (S.D.N.Y. 2016), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017) ("Advertising expenditures are regarded as indirect evidence of the possible effect that advertising may have on consumers' association of the trade dress with the source of the product."). Compare BS Premium's sales to, for example, the sale of Gucci products in a 2012 trademark action: each million dollars' worth of sales by a business carrying the "Premium" mark on its awning may affect consumers differently – and perhaps much less – than each million dollars' worth of sales of handbags, luggage, or footwear that carry a Gucci mark or logo

9

on every product. *See Gucci America, Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 218 (S.D.N.Y. 2012) (noting that the "GRG Stripe" mark appears on twenty percent of all Gucci accessories, making the mark a key identifier); *see also Therapy Prods., Inc. v. Bissoon*, 623 F. Supp. 2d 485, 495 (S.D.N.Y. 2009) (sales figures did not support finding of secondary meaning where plaintiff claimed it made over $4 million from sales of the product but failed to show that these sales figures were linked to a product actually bearing the claimed mark), *aff'd in relevant part sub nom., Erchonia Corp. v. Bissoon*, 410 F. App'x 416 (2d Cir. 2011).

Aside from its sales figures, all that BS Premium marshals in support of the injunction is its advertising budget (totaling, it says, in excess of $245,000 total over the decade-plus period) and unsolicited press coverage. See Pl. Br. 27-28. Plaintiff submits no documentary evidence attesting to its advertising budget, and its bald assertions raise more questions, perhaps, than they answer: BS Premium says, for example, that it spent "nearly $160,000" of the ten-year total in "2020 alone," but does not explain why it spent almost twice as much in 2020 as it had for the prior nine-plus years combined. *See id.*; Khan Decl. ¶ 15. The news coverage BS Premium has assembled is likewise only modestly helpful to its cause: it cites a 2018 New York Times article reviewing an

10

unaffiliated Jersey City restaurant that mentions "Premium Sweets" (unflatteringly) in its twenty-eighth paragraph, *see* Khan Decl, Ex. 20, ECF No. 36-3, and a 2011 article in the same paper about the cricket World Cup that mentions Premium Sweets in passing in a photo caption. Khan Decl., Ex. 19, ECF No. 136-2.[7]

Given the generic nature of the word "Premium," Plaintiff faces a higher burden on the acquired-distinctiveness front – at least as concerns the strength of the word mark itself, without reference to its visual accompaniments (which Plaintiff does not contend have been infringed). *See Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993) (distinguishing the "weak, descriptive" nature of the "mere" word-mark "parents" from the mark as a whole). Plaintiff's evidence is insufficient to establish strong acquired distinctiveness.

Consumer surveys offer "the most direct and persuasive evidence of secondary meaning." *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 426 (S.D.N.Y. 2012). Importantly, BS Premium

---

[7] Plaintiff proffers additional evidence of unsolicited media coverage, but there is no indication that most or all of these mentions appeared in broad circulation. One, for example, is a screen shot of a web page titled "NY Restraurants Guide" – spelling error in original. Khan Decl., Ex. 23, ECF No. 136-5. Other "media coverage" more closely resembles inclusion in the phone book, in that it comes from sources that attempt to include as many businesses as possible (for example, the Yelp page Plaintiff submitted, *see* Khan Decl., Ex. 24, ECF No. 136-6). These submissions do not hurt the Plaintiff's case, of course, but they do not provide tremendous help either.

11

provided none. "The ultimate determination of whether a particular trademark or trade dress has acquired secondary meaning remains an empirical question of consumer association" *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 639. Given the ultimately empirical nature of the issue, "consumer surveys have become the usual way of demonstrating secondary meaning." *Sports Traveler, Inc. v. Advance Magazine Publishers, Inc.*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998). None of this is to say that a plaintiff cannot demonstrate acquired distinctiveness without survey evidence; but it is clear from the caselaw that sales figures are not automatically sufficient, in a case about a generic mark, to establish the requisite likelihood of success on the merits.

Nor does Plaintiff provide evidence of other market participants' attempts to plagiarize the mark in question. *See Car-Freshner Corp. v. American Covers, LLC*, 980 F.3d 314, 329 (2d Cir. 2020) (listing that type of evidence, among others, as supporting a determination of acquired distinctiveness). Under the circumstances, BS Premium has – thus far – established a likelihood that it will show moderate strength, at most, in its use of the "Premium" mark.

**B. Similarity of the Marks**

"When evaluating the similarity of marks, courts consider the overall impression created by a mark." *Brennan's*

12

*Inc.*, 360 F.3d at 133.  "Each mark must be compared against the other as a whole; juxtaposing fragments of each mark does not aid in deciding whether the compared marks are confusingly similar."  *Id.* (defendant's use of his first name was "meaningful" in assessing the similarity of plaintiff's "Brennan's Restaurant" and defendant's "Terrance Brennan's").

Here, the parties' respective marks share almost nothing in common aside from the word "Premium."  Plaintiff's awnings display the word in red, or white with a red background, while PSD's awning is all black, with the words and graphics in light orange/gold.  Color schemes aside, the graphics also look nothing alike.  Plaintiff's graphic – generally visible to the side of the business name – consists of a gold circular design with a "P" written in Sanskrit font.  Defendant's awning, in contrast, has a big circular graphic in the middle, with the business name written at the center.

Considering the overall impression of these marks, I conclude that their significantly different physical appearances cut against the likelihood of confusion.

**C.   Competitive Proximity**

Plaintiff provides a map showing the location of Defendant's new restaurant relative to Plaintiff's offerings.  Khan Decl., Ex. 33.  Defendant does not contest that its new restaurant is in the same geographic area as Plaintiff's

13

businesses and only a few blocks away from one of its storefronts, and that Defendants also sell Bengali restaurant services and grocery items. *See* Defs. Opp. to Prelim. Inj. 7-9. This factor thus favors BS Premium.

**D.   Likelihood that the Plaintiff Will Bridge the Gap**

This *Polaroid* factor is the flip side of the "competitive proximity" coin. Under this factor, "if the owner of a trademark can show that it intends to enter the market of the alleged infringer, that showing helps to establish a future likelihood of confusion as to source." *Lois Sportswear*, 799 F.2d at 874. Given the acknowledged proximity (of geography and product offering), Defendant does not contest that this factor favors Plaintiff. *See generally* Defs. Opp. to Prelim. Inj.

**E.   Evidence of Actual Confusion**

To be relevant under the Lanham Act, confusion must be of a type that "could inflict commercial injury [on the plaintiff] in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991). Evidence of actual confusion includes "mistaken orders, complaints from customers or website visitors, market surveys or other signs of uncertainty reflecting actual consumer confusion." *Big Star Ent., Inc. v. Next Big Star*, 105 F. Supp. 2d 185, 213 (S.D.N.Y. 2000). Ideally, evidence of actual confusion is shown by a

14

"well designed customer survey." *Rush Indus., Inc. v. Garnier LLC*, 496 F. Supp. 2d 220, 227 (E.D.N.Y. 2007). "Confusion may be shown by other means, but the lack of survey evidence counts against finding actual confusion." *Nat. Organics, Inc. v. Nutraceutical Corp.*, 271 F. App'x 89, 90 (2d Cir. 2008). Moreover, "[i]n the absence of surveys, anecdotal evidence can sometimes still be used to show confusion, however it must be more than *de minimis*." *Medici Classics Prods., LLC v. Medici Grp., LLC*, 683 F. Supp. 2d 304, 312 (S.D.N.Y. 2010); *e.g.*, *Nat. Organics, Inc.*, 271 F. App'x at 90 ("Anecdotal evidence of consumer confusion offered by Natural Organics does not compel a finding of actual customer confusion in the absence of direct consumer testimonials or surveys."); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (ruling that two anecdotes of confusion were insufficient to raise a triable issue of actual confusion).

Plaintiff has presented the following evidence of confusion by consumers:

- *Facebook Screenshots*. Plaintiff's Exhibit 18 is a screenshot of what Plaintiff says is a Facebook post by a user called "The Halal Guide." Khan Decl., Ex. 18, ECF No. 24-18. The post itself is short but with the ensuing comments, the exhibit runs seven pages. The post urges readers to "Try out Premium Restaurant and Dessert Shop"

15

— *i.e.*, Defendants' new restaurant. *Id.* In the comments, two users mention Plaintiff's restaurant (amid unrelated questions about parking and whether Defendants' restaurant is really Halal). One user comments that she hopes that "it's as good as the one in Jackson heights"; in response, someone replies that "this place" is owned by her brother-in-law and is "not the same" as Plaintiff's offering. Another user asks*:* "Same premium sweets? They have a location by 168th St. and hillside already." To this, a user replies: "This is a different brand with multiple locations in Canada / Bangladesh." *Id.*

- *"Instances of Confusion" Spreadsheet.* Plaintiff provided a spreadsheet listing its own employees who, it is proffered, "will sign" declarations attesting to the number of people they saw or heard "manifesting confusion about whether Defendant's restaurant is (or will be) owned or operated by Plaintiff" or vice-versa. Khan Decl., Ex. 35, ECF No. 36-17. In total, the spreadsheet reports that these employees observed somewhere "between 109 and 142 people" demonstrating confusion at Defendant's use of the Premium mark. Pl. Br. 27; Khan Decl., Ex. 35.

16

These submissions do not constitute strong evidence of confusion. The screenshots reflect only a couple of data points, and one of them is phrased as much as a question as an expression of genuine confusion. *See* Khan Decl., Ex. 18. The spreadsheet, for its part, lacks any indication of methodological rigor. Sawda Bite, for example, a Manager at Premium Sweets USA, is said to have seen or heard "15-20" people manifesting such confusion. Khan Decl., Ex. 35. In a column calling for a "general description" of such manifestations, the spreadsheet reports that they consisted of "Customer, Friends and co-worker and [also] saw premium Sign and got confuse[d]." *Id.* In my assessment, the spreadsheet has virtually no probative value in its current state. Without direct consumer testimonials or surveys, *see Nat. Organics, Inc.*, 271 F. App'x at 90, or more than *de minimis* anecdotal evidence, Plaintiff cannot show actual confusion. *See Medici Classics Prods.*, LLC, 683 F. Supp. 2d at 312.

**F.  Good or Bad Faith**

"The *Polaroid* good faith factor 'looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between

17

his and the senior user's product."' *Nora Beverages, Inc.*, 269 F.3d at 124 (quoting *Lang*, 949 F.2d at 583).

Here, PSD had already been using the mark for years prior to opening its restaurant in the United States. There is no evidence that it chose this mark in order to free-ride on BS Premium's goodwill and reputation in the community. BS Premium argues that there is bad faith because PSD knew about BS Premium's use of the mark years before opening in Queens, yet proceeded to use the "Premium" name anyway. But "[p]rior knowledge of a senior user's mark does not, without more, create an inference of bad faith." *Medici Classics Prods., LLC*, 683 F. Supp. 2d at 313 (quoting *Playtex Prods. Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 165 (2d Cir. 2004)).

### G. Respective Quality of the Products

"This factor generally considers whether the senior user's reputation could be tarnished by the inferior merchandise of the junior user." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 483 (2d Cir. 1996). Plaintiff fails to produce meaningful evidence regarding the respective quality of its and PSD's products. Indeed, Plaintiff's counsel stated at oral argument that he does "not know anything about" the quality of PSD's product. Conference dated January 31, 2022. Without evidence that PSD's product is of lower quality than

18

Plaintiff's, "this factor lends no support to plaintiff's claim." *Cadbury Beverages, Inc.*, 73 F.3d at 483.

## H. Sophistication of the Consumer

"The sophistication factor recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." *Id.* at 480. "Consumer sophistication may be proved by direct evidence such as expert opinions or surveys. In addition, in some cases a court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product or its price." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 390 (2d Cir. 2005).

Plaintiff argues that this factor has to do with how significant of a purchase the customer is making – for example, a grocery item versus a "big ticket item" such as a car or vacation – because the bigger the ticket, the more recognizable the product and (presumably) the more research time the average consumer will put in. Conference dated January 31, 2022. According to Plaintiff, its service falls in the middle (for example, a nice meal out with the family). *Id.* Because Plaintiff produces no direct evidence of its customer

19

sophistication (nor does Defendant) I conclude that this factor weighs in favor of neither party.[8]

Assessing these factors in the aggregate, I am unable to conclude, on this evidentiary record, that Plaintiff has carried its burden to show a likelihood of success on the merits.

### IV. Conclusion

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is denied. The previously adjourned premotion conference shall take place on April 7, 2022 at 10 a.m.

SO ORDERED.

/s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated:   February 28, 2022
         Brooklyn, New York

---

[8] Because Plaintiff fails to show likelihood of success on the merits, I need not address the three other factors in the preliminary injunction inquiry. Still, it is worth noting Plaintiff's delay in seeking a temporary restraining order (from June 2021 until January 2022) and the relatively speculative nature of the "harm" it alleges, both of which militate against a grant of emergency injunctive relief.